AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of<br>Black 2013 BMW M6 bearing<br>California license plate number 6XJY743 | ) ) ) ) | Case No. 8:22-MJ-00570 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A-3*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute controlled substances |
| 21 U.S.C § 846 | Conspiracy to distribute controlled substances |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_________days (*give exact ending date if more than 30 days*:_____________) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

____________________________
*Applicant's signature*

William Anderson, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ____________________

____________________________
*Judge's signature*

City and state: Santa Ana, California

Hon. Douglas F. McCormick, U.S. Magistrate Judge
*Printed name and title*

AUSA: C. Bisesto

# AFFIDAVIT

I, William Anderson, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of an application for warrants to search:

a. 12234 Greenleaf Lane, Garden Grove, CA 92840 (the "**SUBJECT PREMISES**"), believed to be a residence of John KHUU, as described more fully in Attachment A-1;

b. a white 2020 Tesla Model X bearing California license plate number 8PPM235 ("**SUBJECT VEHICLE 1**"), as described more fully in Attachment A-2; and

c. a black 2013 BMW M6 bearing California license plate number 6XJY743 ("**SUBJECT VEHICLE 2**"), as described more fully in Attachment A-3.

2. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C § 846 (conspiracy to distribute controlled substances) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, and A-3 and B are incorporated herein by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to merely show there is

sufficient probable cause for the requested warrants and does not purport to set forth all my knowledge of, or investigation into, this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR SPECIAL AGENT WILLIAM ANDERSON

4. I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have also been cross designated by the Drug Enforcement Administration and am empowered to investigate and make arrests for offenses under Title 21 of the United States Code.

5. I am currently employed by the United States Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), as a Special Agent ("SA"). I have been so employed since February 2009 and I am currently assigned to the Transnational Narcotics Team in San Francisco, California.

6. I received 25 weeks of law enforcement training at the Federal Law Enforcement Training Center in Glynco, Georgia. The training curriculum covered all aspects of investigations including drug investigations, identification of controlled substances, physical and electronic surveillance, utilization of confidential sources, interview techniques, undercover operations, financial investigation, money laundering

techniques, and the general operation of drug trafficking organizations. This training included instruction in the investigation of federal drug violations, including, but not limited to Title 21, United States Code Sections 841 and 843.

7. During my employment as an HSI Special Agent, I have participated in numerous controlled substance investigations as the primary case agent and participated in debriefs of confidential sources and witnesses who had personal knowledge regarding drug trafficking organizations as well as discussed with numerous law enforcement officers the methods and practices used by drug traffickers. I have also participated in many aspects of drug investigations including, but not limited to, undercover operations, telephone toll analysis, financial analysis, records research, and physical surveillance. Moreover, I have assisted in the execution of federal and state search and arrest warrants related to illegal activities involving controlled substances that resulted in the arrest of suspects and seizure of controlled substances.

8. Through my training, education, experience, and my conversations with other agents and officers who conduct drug investigations, I have become familiar with drug traffickers' methods of operation, including, but no limited to, manufacturing, distribution, storage, and transportation of controlled substances, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

9. I have initiated and/or participated in multiple Organized Crime Drug Enforcement Task Force ("OCDETF") investigations. The OCDETF program is part of the United States Attorney General's strategy to reduce the availability of drugs by disrupting major trafficking organizations through joint collaborations across agencies.

10. I have worked with other experienced agents, law enforcement officers and prosecutors on cases that apply use of electronic surveillance to investigating Drug Trafficking Organizations that are trafficking narcotics internationally and/or across multiple jurisdictions within the United States.

11. I have personally participated in the investigation discussed in this Affidavit as the lead case agent, and I am familiar with the facts and circumstances of the investigation. My role in this investigation, combined with my training and experience, information I have learned from other HSI agents and other law enforcement agencies, my discussions with witnesses involved in the investigation, and my review of records and reports relating to the investigation form the basis for the opinions I set forth in this Affidavit.

## III. SUMMARY OF PROBABLE CAUSE

12. HSI is actively investigating a suspected narcotics trafficker and distributor named John KHUU. HSI has been investigating KHUU since 2019 when a large shipment of MDMA traveling from Germany to San Francisco was intercepted at John F. Kennedy International Airport. That shipment was intended for the Crowne Plaza Hotel in San Francisco. A hotel employee

later confirmed that John KHUU had arranged for the package to be sent to the hotel.

13. In June 2020, HSI again received information that a large shipment of MDMA pills traveling from Germany to San Francisco was intercepted at John F. Kennedy Airport. That shipment was intended for a residential address in San Francisco. Further investigation revealed that John KHUU had also arranged for that package to be sent to the residence in San Francisco.

14. Since the recovery of those two packages, Agents have conducted extensive surveillance on John KHUU and his activities. The investigation revealed that KHUU is actively involved on the dark web[1] selling MDMA and Adderall. In fact, as recently as August 15, 2022, an account on the dark web that agents believe is associated with KHUU engaged in controlled drug purchases on the dark web involving 300 Adderall pills with an HSI undercover agent. As a result, agents believe KHUU remains actively involved in the purchase and sale of narcotics.

15. Additionally, in April 2022, during the course of a

[1] Through my time with HSI, I have investigated numerous narcotics cases on the dark web and, as a result, I am familiar with the dark web. The "deep web" is a portion of the Internet not indexed by search engines, such as internal networks belonging to private industry, government agencies, or academic institutions. The "dark web" is a portion of the deep web that has been intentionally hidden and is inaccessible through standard web browsers. To access the dark web, individuals must use specialized software to access content and websites. Within the dark web, criminal marketplaces operate, allowing individuals to buy and sell illegal items, such as narcotics. Vendors and customers can use monikers across the dark web to sell and buy items.

separate investigation into drug trafficking, KHUU was identified by Fontana Police as being involved in the laundering of money that was the direct proceeds of narcotics related activity. KHUU was ultimately arrested during a surveillance operation involving the transfer of the money. Right before his arrest, KHUU was observed holding a duffel bag with over $240,000 in United States currency.

16. On May 18, 2022, KHUU was indicted in the Eastern District of Texas for a violation of 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering). I have spoken directly with the lead agent from the United States Postal Inspection Service who investigated KHUU for this conduct. Based on my review of the indictment, and discussions with the lead agent from the United States Postal Inspection Service, this charge is the direct result of KHUU's narcotics related activity on the dark web.

17. Because KHUU is still actively engaged with the sale of drugs and the laundering of proceeds from drug related activity, evidence of his activities is likely to be recovered from his current residence.

18. As this investigation has progressed, agents have identified the **SUBJECT PREMISES** as the location where KHUU is currently residing. This is based on surveillance of that specific location, including identifying KHUU coming and going from that residence, and the identification of KHUU's cars immediately outside the SUBJECT PREMISES and inside the garage of the SUBJECT PREMISES. Because the SUBJECT PREMISES is KHUU's

current home, I believe evidence of his drug activities will be located inside this home.

## IV. STATEMENT OF PROBABLE CAUSE

19. Based on my training, experience, my personal involvement in this investigation, conversations with other law enforcement officers, and a review of reports and other documents prepared by law enforcement officers, I know the following facts:

### A. Origins of Investigation

20. On June 19, 2020, U.S. Customs and Border Protection officers located at John F. Kennedy International Airport examined and seized a parcel that contained approximately 5,025 grams of Methylenedioxymethamphetamine, ("MDMA"), a Schedule I controlled substance.

21. On July 2, 2020, HSI and DEA agents executed a controlled delivery of 5,025 grams of MDMA which led to the execution of a federal search warrant at the residence of the intended recipient (hereafter referred to as SOI-1). SOI-1 informed the agents that he did not personally have the package shipped to his home. Rather, a friend of SOI-1's had used SOI-1's address to receive the package. SOI-1 had no knowledge of the contents of the package. Pursuant to SOI-1's cooperation, HSI and DEA agents were successful at coordinating a second controlled delivery to the true owner of the parcel who confirmed they would pick up the package at SOI-1's residence on July 6, 2020.

22. On July 6, 2020, at approximately 11:20 a.m., agents observed a white 2020 Tesla SUV **(SUBJECT VEHICLE 1)** drive down the street and park just shy of the **SUBJECT PREMISES.** Agents observed an Asian male in his mid-20s exit the passenger door and walk towards the residence. While he walked back to the Tesla with the parcel in hand, agents initiated a takedown. The male with the parcel (hereafter referred to as SOI-2) was detained, and the driver of **SUBJECT VEHICLE 1**, identified as John KHUU by both agents and the subject in custody, fled the scene, narrowly avoiding hitting law enforcement who were positioned in the street, in front of KHUU's car, ordering him to stop. A vehicle pursuit was initiated but called off due to KHUU driving erratically and at high rates of speed, ignoring crosswalks, stop signs and red lights at intersections. At approximately 11:55 a.m., agents located **SUBJECT VEHICLE 1** unoccupied and parked on the side of the road approximately a half mile from the incident.

23. Agents returned to the scene and spoke with SOI-2, who told agents that KHUU was the person who fled. SOI-2 told agents that KHUU is the person who ordered and paid for the MDMA pills which were originally in the parcel. SOI-2 told agents that KHUU was an MDMA and Adderall dealer who was also involved in exchanging bitcoin for cash and had a presence on the dark web.

24. That evening, on July 6, 2020, HSI and DEA agents executed a federal search warrant at 1222 Harrison Street, unit "6413", San Francisco, California 94103; the last known address for KHUU. That search warrant was approved by the Honorable

Thomas S. Hixson, United Magistrate Judge for the Northern District of California. When agents arrived, they spoke with the manager of the building who advised they saw KHUU arrive in a hurry and leave shortly after. During the search, agents discovered that the apartment appeared to have been ransacked, with electronic media such as computers and phones missing, along with trash and other misplaced apartment items. Agents recovered a composite ledger which appeared to indicate heavy volume of crypto currency transactions along with banking receipts for withdrawals and deposits. Agents also recovered a locked computer that was imaged by HSI and contained an email address linked to kidcannabis@gmail.com, the email address linked to KHUU and his Dark web presence.

25. Several months following the operation conducted on July 6, 2020, agents identified a dark web account on Empire marketplace[2] associated with John KHUU – vendor name "Kcannabis420". Agents saw that KHUU's vendor name was advertising the sale of Adderall and MDMA pills.[3]

---

[2] Empire Marketplace is a dark web commercial website that allows vendors to sell goods and services, often of an illicit nature, through the dark web. These online market websites use a variety of encryption technologies to ensure that communications and transactions are shielded from interception and monitoring, and operate similarly to clear web commercial websites like Amazon or eBay.

[3] In a post on Empire marketplace, KHUU wrote:

> Find me on Empire, my vendor name is KCannabis420 now. Same PGP, Same Wickr; KidCannabis420 is on vacation. Business will be resuming as usual. I offer cheap Adderall and checkpoint pills (MDMA); 25 units of Adderall for $100 and 10 units of CP pills for $300. [Note: The initial seizure of 5,025 grams of MDMA were blue CP pills.]

26. On or about this time, HSI San Francisco deconflicted the investigation with the United States Postal Inspection Service ("USPIS") out of Dallas, TX. Information provided by USPIS revealed four successful undercover purchases with the "Kcannabis420" account via the dark web involving Adderall pills pressed with methamphetamine.

27. On December 20, 2020, KHUU had a court hearing in San Jose relating to the possession of a firearm while on probation. Following the hearing, HSI and DEA agents conducted surveillance on KHUU. KHUU was surveilled driving northbound on highway 101 in a black BMW bearing California license plate 6XJY743 **(SUBJECT VEHICLE 2)**, at reckless speeds before he was pulled over by California Highway Patrol for speeding. Following the issuance of a speeding ticket, KHUU was then seen driving to 150 Van Ness Avenue, San Francisco, CA 94102, a modern high-rise apartment complex.

28. Following the service of an administrative subpoena related to John KHUU and his association with 150 Van Ness, HSI and DEA agents met with Assistant Manager Justin Sielbach and Chief Building Engineer Todd Fridey. During this meeting, it was discovered that John KHUU had been living in Apartment #627 that was leased under the name of Anthony MUI with a move in date of August 18, 2020.

29. On or about September 2021, agents were notified that MUI requested to change units to 100 Van Ness, #2507, the neighboring building that utilizes the same property management, engineers, and resources. The new lease for Anthony MUI included

a second individual by the name of Michelle MAR. Fridey and Sielbach both told agents that they had seen SUBJECT VEHICLE 1on multiple occasions parking in the below-ground garage and knew that KHUU was residing in unit #627, even though his name was not on the lease.

30. On or about October 2021, while conducting an undercover surveillance operation at 100 Van Ness, San Francisco, CA, an assistant building engineer unfamiliar with the investigation contacted KHUU, advising him that federal agents were on property investigating him. On October 29, 2021, Sielbach made notification to agents that MUI had contacted him, requesting to terminate his lease early due to "weird things happening." Sielbach provided the "residents notice to vacate document" to MUI which was signed on October 27, 2021 with a final inspection date set for November 26, 2021 at 9:00 a.m. Several weeks later, Sielbach told agents that the tenants had paid approximately $14,000 to terminate their lease early and vacated the property leaving behind nothing.

**B. <u>Recent Narcotics-Related Activity</u>**

31. On or about April 6, 2022, following a law enforcement operation by the DEA in San Francisco, CA, agents reviewed a seized cell phone from a known drug dealer operating on the dark web, which revealed recent conversations with John KHUU. The most recent conversations occurred on or about April 3, 2022, via the encrypted platform "Signal". Signal uses a cross-platform centralized encrypted network allowing user to

communicate. In the April 3 conversation, KHUU invited the owner of the phone to visit him in Los Angeles to see his Lamborghini. Additionally, KHUU asked if anyone had been caught, stating "it's hot in SF and is the reason why I moved to LA." Based on these messages, I believe KHUU is still actively involved in selling narcotics and operating in a manner of heightened security to avoid detection by law enforcement following the events that took place in San Francisco.

32. On April 29, 2022, pursuant to an active DEA/Fontana Police Department investigation into a multi-kilogram Mexico-based cocaine dealer residing in Los Angeles, CA, John KHUU was identified as the recipient for a money pickup contract. In my training and experience, this means that KHUU was asked to assist with laundering money that was the proceeds of drug trafficking and sales.

33. During the encounter on April 29, KHUU arrived and was scheduled to pick-up approximately $240,000 in U.S. currency. Following the transaction, KHUU was surveilled to a nearby cul-de-sac where he parked and stayed in his car (a silver BMW that was later impounded by the Fontana Police Department). Moments later, two unidentified Asian males exited a nearby home and KHUU then exited his vehicle, retrieved a black duffle bag from his trunk, and began walking towards the Asian males. During this time, Fontana Police Department announced themselves, causing KHUU to flee on foot. Fontana police officers ultimately arrested KHUU and identified $240,000 in U.S. currency inside the black duffle bag. A search warrant was

subsequently executed at the home, resulting in the seizure of an additional $490,000 in U.S. currency. The vehicle driven by KHUU during this incident was a silver 2015 two-door BMW bearing California license plate W986V0, registered to Hugh BANG at 12234 Greenleaf Lane, Garden Grove CA 92840 (the **SUBJECT PREMISES**).

34. On or about May 18, 2022, KHUU was indicted in the Eastern District of Texas for a violation of 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering). I personally spoke with the lead agent from USPIS for that investigation. It is my understanding that USPIS conducted multiple purchases of narcotics from KHUU on the dark web in exchange for Bitcoin. These sales occurred throughout 2020. KHUU then exchanged the Bitcoin for U.S. currency on the dark web and ultimately transferred the currency to several legitimate bank accounts that had been opened by various associates throughout the United States. KHUU would have these associates retrieve cash from these various bank accounts at his request. During the course of the charged conduct, KHUU engaged in 478 financial transactions involving the sale of 622.90718 Bitcoin in exchange for $5,356,828.28.

35. On August 15, 2022, while continuing to investigate KHUU, HSI Agents identified a username on the dark web with the handle “4America”. “4America” has been actively advertising the sale of MDMA and Adderall. Agents noticed that “4America” used similar language and was promoting the same type of drugs that KHUU used to advertise with the “KCannabis420” dark web handle.

Specifically, "KCannabis420" would often advertise both MDMA pills and Adderall pills. "KCannabis420" referred to MDMA pills as "CP". "4America" has been recently promoting the exact same drugs and referring to MDMA as "CP". In my experience, using this specific language and promoting MDMA and Adderall together is highly unique. I also spoke with an HSI Agent with over seven years of experience investigating drug sales on the dark web. He also confirmed the uniqueness of the similarities between "KCannabis420" and "4America". In his opinion, John KHUU is now operating the "4America" handle on the dark web. Additionally, "KCannabis420" has not been active on the dark web since KHUU was indicted in the Eastern District of Texas. Given the extreme similarities between the activities of the "4America" handle and the "Kcannabis420" handle, I believe that KHUU is now selling drugs on the dark web as "4America".

36. On August 15, 2022, an undercover HSI Agent purchased 300 Adderall pills from "4America" on the dark web. This further indicates KHUU remains actively involved in the illegal distribution of narcotics.

37. On August 17, 2022, KHUU was indicted in the Northern District of California for two counts of violating 21 U.S.C. § 952(a)- importation of MDMA. This indictment was the result of KHUU's importation of packages of MDMA from Germany in May of 2019 and June of 2020 (the June incident is mentioned above). As a result of this indictment, KHUU has an active warrant out for his arrest.

C. **Observation of KHUU in Southern California**

38. On July 12, 2022, during a routine traffic stop conducted by the Beverly Hills Police Department, KHUU was identified as driving the same white Tesla that was encountered on July 6, 2020 (**SUBJECT VEHICLE 1**). During this stop, KHUU gave a fictitious address in Richmond, CA for where he is residing. KHUU was given a warning for not having a front license plate and released.

D. **Observations at the SUBJECT PREMISES**

39. On August 10, 2022, HSI agents along with the Anaheim Police Department, located KHUU's black BMW **(SUBJECT VEHICLE 2)** parked in an apartment complex located at 12234 Greenleaf Lane, Garden Grove, CA 92840. On that same day, Anaheim Police Detective Jossue Hernandez saw **SUBJECT VEHICLE 1** pull into the garage of the **SUBJECT PREMISES.**

40. On August 11, 2022, HSI and Anaheim Police Department officers observed an Asian male exit the **SUBJECT PREMISES**, walking a Pomeranian dog along with another unknown small dog. Prior to KHUU moving to Los Angeles, surveillance operations in San Francisco identified KHUU driving **SUBJECT VEHICLE 1** as a primary transportation vehicle, and on multiple occasions, with a Pomeranian in the front seat.

41. On August 12, 2022, at approximately 7:55 p.m., Anaheim Detective Hernandez positively identified KHUU exiting the garage of the **SUBJECT PREMISES**, closing the door with his cell phone, and entering a ride share vehicle. At approximately

9:05 p.m. that evening, KHUU was seen exiting the **SUBJECT PREMISES** garage door again, walking a small Pomeranian dog.

42. Because KHUU is still engaged in the sale and possession of narcotics and is known to mask his identity by living under assumed names, driving vehicles subleased by the leaseholder for monthly payments in cash, using a VPN and encrypted chats to communicate, and hiring close friends to open business bank accounts to make deposits and withdraws at his direction to avoid detection by law enforcement, a search warrant at the **SUBJECT PREMISES** will yield information related to KHUU's current illegal activities.

43. Additionally, I know from personal experience that KHUU uses **SUBJECT VEHICLE 1** and other vehicles identified above in connection with and in furtherance of his drug trafficking activities in violation of the Subject Offenses. In fact, in July 2020, I witnessed KHUU drive **SUBJECT VEHICLE 1** to a location in San Francisco to retrieve drugs he had imported from Germany. As further explained in Section V below, the search warrants sought in this application, specifically the search of the **SUBJECT VEHICLES**, are expected to lead to additional evidence of the Subject Offenses.

44. Finally, the information associated with the warrants sought will assist agents in advancing the investigation to identify additional associates and co-conspirators responsible for the Subject Offenses, as well as determining whether KHUU utilizes drug "stash houses," and seizing evidence of the Target Offenses.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

45. Based on my training, experience, and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

46. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities, to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds. Documents relating to such travel, including calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug traffickers in their residences, stash houses, on their cell phones and other digital devices, and/or vehicles where they are readily available for use or reference.

47. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, documents, and other records relating to the manufacture, importation, exportation, transportation, ordering, sale and distribution of drugs and/or controlled substances and illegal proceeds, including invoices, shipping labels, tracking numbers, boxes, and envelopes. The

aforementioned records are often maintained where drug traffickers have ready access to them, such as at their residences, stash houses, on their cell phones and other digital devices, and/or in their vehicles where they are available for reference and concealed from law enforcement.

48. They commonly store drugs and drug paraphernalia, including packaging materials, cutting agents, and manufacturing tools in their residences, stash houses, storage units, and/or vehicles to have ready access to the drugs and/or paraphernalia to conduct their drug trafficking business or to use those drugs personally and because they believe these locations are relatively safe.

49. Because drug traffickers often "front" drugs to their customers - that is, sell the drugs on credit - or receive drugs from their suppliers on credit, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and suppliers. These ledgers are more commonly known as "pay/owe sheets" and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets and are frequently encoded to protect those involved. Drug traffickers often keep such records on their person or in their residences, stash houses, on their cell phones and other digital devices, and/or vehicles.

50. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and

from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

51. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

52. Drug traffickers often use vehicles to transport their drugs and may keep stashes of drugs in their vehicles in the event of an unexpected opportunity to sell drugs arises.

53. Drug traffickers commonly keep large sums of currency, financial instruments, precious metals, jewelry, gift cards, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances. When drug traffickers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement. To accomplish this, drug traffickers often use different techniques, including the use of digital currency, foreign and domestic banks and

their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source. In my training an experience, amounts of currency (cash) over $2,000 connected to a known drug trafficker, including in their residences and vehicles, are likely to be connected to drug trafficking activities.

54. They also purchase real estate or vehicles and establish shell corporations and business fronts that they use to launder drug proceeds. Drug traffickers often utilize fictitious or "straw-holder" owners to conceal the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug sales. In addition, drug traffickers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business. Drug traffickers often keep these items of value, and records relating to them, on their person or in their residences, stash houses, storage units, and/or vehicles where they are concealed from law enforcement and readily available.

55. They go to great lengths to hide and secure the drugs, drug proceeds, other items of value and records relating to their drug business. This is to safeguard those items against robbery and keep them from law enforcement. These secure locations typically include safes, vaults, or other locked containers, as well as specially constructed concealed compartments such as those often found in vehicles used specifically to facilitate drug trafficking. Other methods of

concealment include the burial of such items underground, the use of locked vehicles, trailers, out buildings, sheds, and/or exterior closets, the use of natural spaces within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning machines.

56. They often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written airbills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services to further insulate themselves from detection by law enforcement. Drug traffickers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash houses, and/or in their vehicles where they are available for reference.

57. Drug trafficking is an ongoing business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and persons to launder the drug proceeds.

These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained on their person or in their residences, stash houses, and/or vehicles, so they are readily available to efficiently conduct their drug trafficking business. Moreover, such records are often stored electronically within the memory of telephones, computers, and/or personal digital assistants such as iPhone and Blackberry devices.

58. They frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take such items and/or harm them during transactions. Such weapons, which are often stolen or otherwise possessed illegally, are typically maintained on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available.

59. They frequently take, or cause to be taken, photographs and/or videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs.

60. They often use electronic devices such as cellular telephones -- using digital communications applications such as

Blackberry Messenger, WhatsApp, and the like, satellite telephones, text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, simple and often prepaid flip phones, known colloquially as "drop phones," and/or personal digital assistants such as iPhone and Blackberry devices to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities by phone, text message, or email. Drug traffickers often keep the records listed above on those devices. Drug traffickers often use multiple phones, including not only their own phones but also phones of family members or significant others to avoid detection by law enforcement. Drug traffickers often keep these devices in their residences, stash houses, businesses, and/or vehicles where they are readily available.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

61. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, *inter alia*, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the

Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures

are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

62. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

63. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress John KHUU's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of John KHUU's face with his/her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

64. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. REQUEST FOR NIGHT SERVICE

65. Night service is being requested pursuant to the search warrant operation requested in this affidavit. KHUU has an extensive criminal history including arson resulting in conviction for involuntary manslaughter, possession of a loaded firearm on multiple occasions, possession of controlled substances, driving excessive speeds, hit and run with a motor vehicle, DUI, obstruction of a police officer on multiple encounters, resisting arrest and kidnapping. KHUU failed to obey law enforcement during a controlled delivery operation on July 6, 2020 resulting in an HSI Special Agent almost getting run over by him. KHUU then fled in a Tesla Model X through the city of San Francisco at high rates of speed with no consideration to red lights, cross walks or busy intersections. KHUU lives vicariously with close friends but not under his own name, drives vehicles registered to other associates and used his access to cryptocurrency and the dark web to fund his lifestyle without leaving a footprint. KHUU’s anonymity allows him to continue to have zero consideration for the safety of others and is a danger to the community. He is erratic, doesn’t think about his actions and will evade law enforcement at any cost. For these reasons, night service is being requested to execute the search safely and effectively without incident.

66. Additionally, the **SUBJECT PREMISES** is located right next to Walton Intermediate School, a school located at 12181 Buaro Street, Garden Grove, California. Through my review of the school website, Walton Intermediate is currently in session. The library for the school opens as early as 7:30am. As a result, there is likely to be a significant amount of foot and vehicle traffic in the vicinity of the **SUBJECT PREMISES** during the daytime. Agents intend to arrest KHUU pursuant to his active arrest warrants at the time the search is executed. KHUU's history, as documented above, suggests he will attempt to flee or use force against law enforcement. Therefore, to best protect the safety of the community, I am asking to be able to execute this warrant during nighttime hours.

//

//

//

## VIII. CONCLUSION

67. Based on the information above, there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of the **SUBJECT PREMISES, SUBJECT VEHICLE 1,** and **SUBJECT VEHICLE 2,** as described in Attachments A-1 through A-3, respectively.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 18th day of August 2022.

____________________________________

HONORABLE DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A-1

The premises known as 12234 Greenleaf Lane, Garden Grove, CA 92840 ("SUBJECT PREMISES") is clearly marked on the front door as "12234". The garage is at the back of the home, but can be seen and accessed from the street. The garage is also clearly marked with a placard bearing "12234" above the top right portion of the garage door. The garage and the front door are the only two ways to enter the unit. The front door is blue in color with what appears to be a white stucco exterior. The place to be searched shall include all storage areas and spaces, outbuildings, closets, and garages (whether attached or detached) any containers yard areas within the curtilage dedicated to the place to be searched, and vehicles parked in parking spaces dedicated to the place to be searched and or otherwise included in Attachment A. SUBJECT PREMISES to be searched includes: (a) all rooms, porches, containers, and safes in SUBJECT PREMISES 1; (b) the driveway, and any garages, carports, storage spaces, or other outbuildings on SUBJECT PREMISES 1; (c) any cars or vehicles parked in any garage, carport, driveway, backyard, or otherwise at the residence; and (d) any digital devices found at SUBJECT PREMISES or in the possession of anybody at SUBJECT PREMISES.

Front Door




Garage Door



**ATTACHMENT A-2**

SUBJECT VEHICLE 1 is a white, 2020 Tesla Model X, bearing California license plate number 8PM235. The VIN for the vehicle is 5YJXCDE49LF262985.

| | |
|---|---|
| Vehicle: | 2020 Tesla Model X |
| Color: | White |
| License Plate: | 8PPM235 |
| VIN: | 5YJXCDE49LF262985 |






**ATTACHMENT A-3**

SUBJECT VEHICLE 2 is a black, 2013 BMW M6, bearing California license plate number 6XJY743. The VIN for the vehicle is unknown.

| | |
|---|---|
| Vehicle: | 2013 BMW M6 |
| License Plate: | 6XJY743 |
| Color: | Black |
| VIN: | N/A |



## ATTACHMENT B

### I. ITEMS TO BE SEIZED

The following items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846(the "Subject Offenses"), namely:

1. Narcotics or other controlled substances;

2. Narcotics distribution, manufacturing and conversion paraphernalia, including weighing instruments, diluting and cutting agents, packaging materials, and chemicals;

3. Firearms and ammunition, including but not limited to handguns, pistols, revolvers, and other weapons, as well as any records or receipts pertaining to firearms and ammunition;

4. Evidence of occupancy, residency, control, and/or ownership of the place/thing identified in Attachments A-1 through A-3, including but not limited to utility bills, cable bills, property tax bills, notices, vehicle sales invoices and registration, and leases;

5. Keys belonging to and/or evidencing of the existence or usage of any lockers, safe deposit boxes, storage facility, vehicle, or other property;

6. Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase, or distribution of controlled substances, or firearms and ammunition;

7. Records or documents pertaining to domestic and international travel, including but not limited to passports,

travel vouchers, air travel receipts, gas receipts, hotel receipts, and meal receipts;

8. Records or documents pertaining to postal and private package delivery services, including air bills, receipts, containers, and packages;

9. Books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, wire transfer receipts, safe deposit box keys, money wrappers, and other items evidencing the obtaining secreting, transferring, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money;

10. Any and all documents, records or information relating to the transfer, purchase, sale or disposition of virtual currency;

11. Any and all documents, records, or information relating to the access, creation and maintenance of websites and hidden (TOR-based) services;

12. Any and all documents, records, or information relating to email accounts used in furtherance of these offenses;

13. Any and all records or other items which are evidence of ownership or use of computer equipment, including, but not limited to, sales receipts, bills for internet access, handwritten notes and handwritten notes in computer manuals;

14. Any and all records of any address and/or telephone books, rolodex indicia, electronic organizers, telephone paging devices and the memory thereof, and any papers, records or electronic data reflecting names, addresses, telephone numbers, pager numbers of co-conspirators, sources of controlled substances and/or virtual currency, identifying information for customers purchasing controlled substances and/or virtual currency;

15. U.S. currency, precious metals, jewelry, and financial instruments, including certificates of deposit and stocks and bonds used in furtherance of the above-listed offenses;

16. Virtual currency in any format, including but not limited to, wallets (digital and paper), seed words, usernames and passwords, public keys (addresses) and private keys used in furtherance of the above-listed offenses;

17. Photographs, including still photos, slides, negatives, video tapes, films, undeveloped film and the contents therein, depicting possible associates, possible co-conspirators, assets, and/or controlled substances, and/or firearms and ammunition;

18. Address and/or telephone books, rolodex indices, and any pagers reflecting names, addresses, telephone numbers, pager numbers, fax numbers, and/or telex numbers of possible co-conspirators, possible sources of supply, possible customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

19. Telephone bills and toll records;

20. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

21. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment of other devices;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e. evidence of the times the device was used;

f. applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g. records of or information about Internet Protocol addresses used by the device.

22. As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

23. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## I. **SEARCH PROCEDURE FOR DIGITAL DEVICE(S)**

1. In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in

their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data and may access such data at any time.

f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in

circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

2. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3. In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a. Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

4. During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumb- and/or fingers of John KHUU onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of John KHUU with that person's eyes open to activate the facial-, iris-, or retina-recognition feature, to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

5. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.